**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ANNA PALOVA | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Cause No. 21-3451 |
| | § | Jury |
| | § | |
| UNITED AIRLINES, INC., | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

COMES NOW, Anna Palova ("Plaintiff" or "Palova") and files this First Amended Complaint against Defendant United Airlines, Inc. ("Defendant" or "United Airlines") for her claims of age discrimination under the Age Discrimination in Employment Act and in support thereof respectfully shows the following:

**I. PARTIES**

1. Plaintiff Anna Palova is a Texas citizen who resides at 402 Savannah Springs Way, Spring, Texas 77373.

2. Defendant United Airlines, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, United has been properly served and has made its appearance though counsel, and may be served with this amended complaint through its counsel of record.

**II. CONDITIONS PRECEDENT**

3. All conditions precedent to the filing of this suit have been met.

4. On or about August 25, 2020, Plaintiff filed a complaint of discrimination against Defendant under Charge Number 460-2020-05495 with the Equal Employment Opportunity Commission ("EEOC").

5. This action is filed after 180 days has passed since the Plaintiff filed her Discrimination Charge as required by TCHRA.

6. On or about July 26, 2021, the EEOC issued a Notice of Right to Sue letter entitling Plaintiff to file an action in this Court for her claims. A true and correct copy of the Notice of Right to Sue letter is attached as Exhibit A.

7. This action was filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue letter.

8. Plaintiff has exhausted all federal and state administrative requirements to file this complaint.

### III. JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over all federal claims in this dispute under 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 626(b) and (c).

10. The Court has subject matter over all state-law claims asserted in this action under 28 U.S.C. § 1367.

11. The Court has personal jurisdiction over Defendant because Defendant conducts business operations and has offices in this District.

12. Venue is proper under in the Southern District of Texas to 42 U.S.C. § 2000e-5(f)(3) because (1) an unlawful employment practice is alleged to have been committed in this district; and (2) employment records relevant to such practice are maintained and administered in this District. Additionally, or in the alternative, venue is proper in this District pursuant to 28

U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTS

13. Anna Palova was a dedicated and committed airline employee from 1992 until her discharge on February 28, 2020. Ms. Palova was first employed with Continental Airlines and became an employee with United Airlines ("Defendant") as a result of the merger between Continental Airlines and United Airlines in 2010.

14. Ms. Palova began her career with Continental Airlines in January 1992 as administrative support for the Flight Attendant Recruiting Department. She then transferred to the Flight Attendant Training Department in 1993 to begin training as a flight attendant.

15. In 1994, Ms. Palova became a Continental Airline's Flight Attendant stationed out of Newark, New Jersey before transferring as a Flight Attendant to Houston, Texas, Continental's headquarters based out of Houston Bush Intercontinental Airport ("IAH").

16. For a time, Ms. Palova returned to working in the Flight Attendant Training Department and working in Regulatory Compliance before returning to flying full-time in 1997.

17. In her twenty-eight years working for Continental and then United, in the airline industry, Ms. Palova never received a disciplinary warning and maintained a stellar record throughout her employment with Continental Airlines and Defendant – a record that reflected no attendance or performance infractions – until her discharge on February 28, 2020 for alleged violations of company policies. See Exhibit B.

18. Throughout her twenty-eight years with Continental and Defendant, Ms. Palova was selected and served as an Initial Operating Experience ("IOE") Evaluator, an Onboard Safety Evaluator from 2013-2014, and was selected to participate in the 2016 contract negotiations

between Defendant and the Association of Flight Attendants ("AFA") as a special subject matter expert on the trip-trade section of the contract.

19. A Flight Attendant's assigned trips are referred to as her "line of flying" or "line." Pursuant to the Joint Collective Bargaining Agreement ("JCBA") negotiated between Defendant and the Association of Flight Attendants ("AFA"), Flight Attendants have unlimited trip trading with open time and with fellow Flight Attendants. See Exhibit C. Flight Attendants may also pick up trips that have been dropped by Flight Attendants and other unassigned trips.

20. Despite her twenty-eight years of impeccable service, Ms. Palova was unfairly and maliciously discharged by Defendant for pretextual reasons regarding alleged "parked trips" and "egregious violations of Company policy."

21. At the time of her termination, Ms. Palova was 58 years old and served as a Senior Flight Attendant for Defendant. Senior Flight Attendants receive the benefit of preferential flights, the ability to pick up flights ahead of Junior Flight Attendants, a higher pay rate, significant health benefits, unlimited flying benefits, and paid time off. Moreover, after twenty-five years of service, flight attendants receive *unlimited flying benefits*. With thirty-two years of service, Ms. Sjoberg qualified for this benefit under her contract; however, because of the allegations in her termination letter, United has deprived her of this benefit.

22. Senior Flight Attendant positions are held by older employees who are paid more and are entitled to greater benefits than their junior counterparts that cost United more money to retain.

23. The JCBA, which governs the terms of a Flight Attendant's employment, does not define "parked trips" or "parking trips." The only reference to "parking" is under section 7.I.19,

which merely states "[t]he placement of trips on other Flight Attendant's lines to facilitate trading ("parking") is not permitted."

26. Defendant tasked Corporate Security with pulling trade data from Flight Attendants whom Defendant hand selected. Defendant first started with international Flight Attendants based out of old Continental hubs, including Houston, TX (IAH), Newark, NJ (EWR) and San Francisco, CA (SFN). Only Senior Flight Attendants at these former Continental hubs are offered international trips on their "line."

27. On February 17, 2020, Ms. Palova received a Letter of Investigation ("LOI") from Defendant. The LOI identified three trip pairings that were being investigated. The trip pairings were trips identified as: Pairing H6500 on April 11, 2019; Pairing H5008 on May 1, 2019; and Pairing H6905 on July 9, 2019. Exhibit D.

28. A meeting was scheduled for February 20, 2020, between Ms. Palova and Defendant's Corporate Security division.

29. Section 23.A.2 of the JCBA, entitles Ms. Palova to the "right to respond to the charge(s) and present information relevant to the investigation."

30. However, despite having this right under the JCBA, the February 17th letter Ms. Palova received identified three trips in question that were all more than six months old, and the only data available to Ms. Palova for review from Defendant prior to her hearing was trip data that only covered the previous six-month window. Defendant knew Ms. Palova could not access data that covered and included the specific three trip pairings under investigation through the United system and intended to use trip pairing data that clearly disadvantaged Ms. Palova in preparing her response to the investigation.

31. At the February 20, 2020, meeting (the "Meeting"), and for the first time since receiving the LOI, Ms. Palova was presented with her entire trade history from April 2019 through December 2019 and a blank questionnaire to complete during the meeting. Ms. Palova 's entire trade history consisted of hundreds of trades, which is entirely customary for Flight Attendants working for Defendant and within the industry.

32. After a lengthy presentation at the Meeting by Defendant, Ms. Palova was asked to answer questions about only two of the pairings under investigation – the April 11th and May 1st pairings ("the Pairings").

33. Ms. Palova was never questioned at the meeting or subsequently about the July 9th pairing; however, the July 9th trip pairing was subsequently listed in her termination letter.

34. Upon questioning, Ms. Palova denied the allegations of "parking" by Defendant and offered truthful responses, which explained that the trips were facilitated as honest trades and justifiable scheduling conflicts prevented Ms. Palova from completing the flight and/or the trade.

35. Further, United did not talk to nor investigate the other Flight Attendants Ms. Palova traded trips with for the alleged parked trips.  The explanations provided by Ms. Palova as to the April 11, 2019 and May 1, 2019 trip pairings could have been confirmed and corroborated by the other Flight Attendants as well as the documentation presented by Ms. Palova, but United failed to fully investigate.

36. Defendant improperly referred to Ms. Palova's April 11th trip trade as an illegal parking and stated that she "put the trip on the Flight Attendant's line."  However, Ms. Palova made an equal trade with the Flight Attendant, which is commonly referred to as a "trip for trip trade" and allowed for under the JCBA.

37. Prior to her discharge, Ms. Palova provided medical documentation and information to Defendant. Ms. Palova suffers chronic sinus infections, which is commonly referred to as sinusitis. Ms. Palova sees her allergy doctor, Dr. Liu, every week for continued treatment and for weekly shots. She had a Family Medical Leave Act ("FMLA") letter on file with United excusing her for one day off monthly without recourse should her Flight Line fall on a day that she had to see her doctor or if she fell ill due to her illness.

38. Specifically, medical documentation supported her justification regarding the May 1, 2019 pairing. At the time Ms. Palova's Flying Line came out for May 1, 2019, she dropped the trip to visit the doctor. Ms. Palova had the option to work the trip or go to the doctor on May 1, 2019, which she could have done either. The Flight Attendant that first picked up the May 1, 2019 flight later realized the flight schedule conflicted with her custody schedule for her minor son. However, before the Flight Attendant contacted Ms. Palova regarding the scheduling conflict, Ms. Palova picked up a trip to Amsterdam. Then shortly after she picked up the Amsterdam trip, another Flight Attendant on Facebook offered a different Amsterdam trip for different days, and Ms. Palova traded her first Amsterdam flight for the second Amsterdam flight by agreement through the Facebook group. Ms. Palova was then contacted by the Flight Attendant that picked up the original Buenos Aires trip letting Ms. Palova know that she had a scheduling conflict during the Sao Paulo trip and asking Ms. Palova if she wanted the trip back. Because Ms. Palova did not have a scheduling conflict at that time, she picked the trip back up.

39. On the day of the flight, Ms. Palova needed to see her doctor for her sinusitis. She ultimately advertised the trip and dropped it to an out of base Flight Attendant. She traded her Amsterdam trip before she picked up the Buenos Aires trip back from a Flight Attendant that could

no longer work it. Ms. Palova did not take any compensation for the trip. This documentation was completely ignored by Defendant.

40. No evidence was presented by Defendant at any time prior to Ms. Palova's wrongful discharge that she had personally gained from any alleged "parked trips."

41. No evidence was presented by Defendant at any time prior to Ms. Palova's wrongful discharge that she had "egregiously violated" any company policies.

42. Despite the overwhelming proof that Ms. Palova did not engage in "parking" trips as alleged by Defendant, Ms. Palova was terminated on February 28, 2020. See Exhibit B. Defendant cited JCBA section 7.I.19, which merely states "the placement of trips on another Flight Attendant's lines to facilitate trading ("parking"), and that "it is not permitted and that that it is dishonest and unethical to withhold United Airlines property, specifically pairings, for your personal gain."

43. However, Ms. Palova never received any compensation, benefit or brokering for these trades. Ms. Palova was in compliance with JCBA section 7.J.1., which authorizes unlimited trip trading.

44. Flight Attendants can facilitate trades through various mediums— as long as they do not "receive compensation, benefit, or brokering for the trades." *See* JCBA section 7.I.19.

45. United is not only aware of different trip trading social media pages or mediums to facilitate trades, but it has also specifically approved Facebook pages, personal trades between known colleagues, and trades through United's scheduling system.

46. Based on information and belief, Defendant singled out and investigated Senior Flight Attendants, including Plaintiff, and trip trading involving Senior Flight Attendants based

out of IAH. Defendant did not investigate any Junior Flight Attendants at IAH for trip trading whether those trips were domestic or the more desirable international flights.

47. Specifically, United singled out three trip trades--out of hundreds conducted by Ms. Palova throughout her trade history--made from April 2019 through August 2019.

48. Although United's Corporate Security could gather data dating back to April 2019, Ms. Palova's employee access could only retrieve trade data for the previous sixth months. Therefore, Ms. Palova could only retrieve trade data dating back to July 2019 and had no access to information regarding the April 2019 and May 2019 trades identified by Defendant.

49. During Ms. Palova's interview with corporate security, she answered their questions and provided reasoned responses regarding the trips and pairing information cited in the initial investigation letter, which supported a correct finding that the trips were not "parked" or in violation of any company policy. Most importantly, Ms. Palova never received financial compensation or improperly accessed the computer system to facilitate these trades.

50. Ms. Palova participated in the investigation and complied by providing a statement and completing United's Corporate Security Interview Questionnaire (the "Questionnaire"). The questionnaire was intentionally written by United to create confusion over the definition of parking. Exhibit E.

51. The first question on the questionnaire asks "Since April 2019 have you placed a trip(s) on other Flight Attendant's line to facilitate Trading ("parking")? If yes, explain the circumstances?" If the flight attendant answers yes, he or she has admitted to violating company policy by "parking" trips. But as in the present case, Ms. Palova answered "no" because she did not engage in any behavior that constituted parking trips. The question, as posed, was intended to

confuse, and create an impossible truthful answer for the answering employee because the JCBA's definition of trading is not synonymous with parking.

52. The JCBA, as adopted and accepted by the AFA, does not ban trading, but allows Flight Attendants unlimited trading.

53. After Ms. Palova was wrongfully terminated, she filed a grievance pursuant to Section 23 of the JCBA. The JCBA authorizes a four-tier grievance process to appeal disciplinary actions up to termination.

54. Ms. Palova filed her first level appeal of her termination in the grievance process, that appeal was denied by Defendant and the Defendant has failed to move the grievance process forward pursuant to the terms of the JCBA. [1]

55. The Local Executive Council ("LEC") President referred this matter to the Master Executive Council ("MEC") President. United has refused, however, to follow the grievance protocols identified in Section 23 of the JCBA. Defendant's refusal to adhere to the grievance protocols deprived Ms. Palova of her right to appeal her discharge and to have her appeal timely heard pursuant to the grievance process.

56. Based on information and belief, Defendant singled out and investigated what it labelled "high value trips." These trips were in all actuality international trips, trips which are held by Defendant's Senior Flight Attendants, individuals who are compensated more than their Junior Flight Attendants counterparts.

57. Based on information and belief, Ms. Palova was singled out by Defendant for investigation into alleged "parking trips" because of her age and seniority.

---

[1] Grievance step one filed and denied; company has refused to move forward with grievance step two level has been filed. JCBA required to allow four step grievance process for FA that is not in probationary period.

58. Based on information and belief, Defendant singled out Ms. Palova because of her age and intended to terminate her at the time it issued the February 17, 2020 LOI by using intentionally misleading questionnaires and interrogations that would lead to the same predetermined result despite Ms. Palova giving honest answers that fit the reasonable explanations of what is not considered parking by United but still led her to pretextual termination.

59. Based on information and belief, Ms. Palova's termination was used as an intimidation tool to force other Senior Flight Attendants into early retirement. Shortly after Ms. Palova was terminated by Defendant, on or about March 26, 2020, United offered early retirement packages to Senior Flight Attendants. Different packages were offered to Flight Attendants based upon their age and years of service. Hundreds of Senior Flight Attendants took the early retirement from IAH.

60. Post-merger, previous United Flight Attendants and previous Continental Flight Attendants operated and were governed under two separate contracts. Defendant attempted to enforce the rules and requirements of the old United Flight Attendant contract on Continental Flight Attendants.

61. Under the old United contract with United Flight Attendants, a Flight Attendant could not take back trips once those trips had been either dropped from the Flight Attendant's flying line—this was not a rule or requirement for Continental Flight Attendants and not a restriction in the current JBCA.

62. Defendant treated Ms. Palova differently than Flight Attendants who were not as senior in rank by using the alleged parking violations as a pretext for her termination

## V. FIRST CAUSE OF ACTION – AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

63. Plaintiff incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

64. As described above, Plaintiff has been subjected to discrimination based on her age in violation of the Age Discrimination in Employment Act ("ADEA"). *See* 29 U.S.C. Ch. 14, *et seq.*

65. Defendant is an employer within the meaning of the ADEA. *See* 29 U.S.C. § 630(b).

66. At all relevant times, Plaintiff was over 40 years of age. *See* 29 U.S.C. § 631(a).

67. Defendant did not make a good faith effort to comply with statutes against discrimination.

68. Defendant violated the ADEA when it discharged and discriminated against Plaintiff because of her age. *See* 29 U.S.C. § 623(a)(1).

69. Defendant knowingly, willfully, or with reckless disregard, carried out its illegal patterns or practices regarding discrimination towards Plaintiff.

70. Defendant willfully violated the ADEA.

71. Plaintiff was subjected to different terms and conditions of employment because of her age.

72. Plaintiff has not been afforded the same terms and conditions of her employment as similarly situated employees outside Plaintiff's protected category.

73. Defendant and its authorized representatives violated Plaintiff's rights by singling out Senior Flight Attendants' trips, like Ms. Palova, creating ambiguous trip trading policies, and conducting hearings without due process.

74. Further, Defendant acted with malice or, in the alternative, with reckless indifference to the federally protected rights of Plaintiff.

75. Defendant's act of singling out senior Flight Attendants for investigation by Defendant's Corporate Security and for alleged "parking trip" violations had a disparate impact on Plaintiff. The allegations in this paragraph as well as the paragraphs above will likely have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

76. As a result of Defendant's age discrimination and actions or inaction in violation of the ADEA, Plaintiff has suffered loss of wages and benefits, both in the past and in the future, as well as emotion pain, mental anguish, suffering, inconvenience, and loss of enjoyment of life in the past, all of which were caused by Defendant's treatment of Plaintiff and, in all probability, Plaintiff will continue to suffer such damages in the future.

## VI. SECOND CAUSE OF ACTION – AGE DISCRIMINATION IN VIOLATION OF THE TEXAS COMMISSION ON HUMAN RIGHTS ACT ("TCHRA")

77. Plaintiff incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

78. As described above, Plaintiff has been subjected to discrimination based on her age in violation of the Texas Labor Code. *See* Tex. Labor Code, Title 2, Ch. 21, *et seq.*

79. Defendant is an employer within the meaning of the Tex. Labor Code § 21. 002 (8).

80. At all relevant times, Plaintiff was over 40 years of age. *See* Tex. Labor Code §21.101.

81. Defendant did not make a good faith effort to comply with statutes against discrimination.

82. Defendant violated the Texas Labor Code when it discharged and discriminated against Plaintiff because of her age, and/or because age was a motivating factor for Defendant to terminate Plaintiff. *See* Tex. Labor Code §21.051(2).

83. Defendant knowingly, willfully, or with reckless disregard, carried out its illegal pattern or practice regarding discrimination towards Plaintiff.

84. Defendant willfully violated the TCHRA and the Tex. Labor Code.

85. Plaintiff was subjected to different terms and conditions of employment because of her age.

86. Plaintiff has not been afforded the same terms and conditions of her employment as similarly situated employees outside Plaintiff's protected category.

87. Defendant and its authorized representatives violated Plaintiff's rights by singling out Senior Flight Attendants' trips, like Ms. Palova, creating ambiguous trip trading policies, and conducting hearings without due process.

88. Further, Defendant acted with malice or, in the alternative, with reckless indifference to the federally protected rights of Plaintiff.

89. Defendant's act of singling out senior Flight Attendants for investigation by Defendant's Corporate Security and for alleged "parking trip" violations had a disparate impact on Plaintiff. The allegations in this paragraph as well as the paragraphs above will likely have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

90. As a result of Defendant's age discrimination and actions or inaction in violation of the Tex. Labor Code, Plaintiff has suffered loss of wages and benefits, both in the past and in the future, as well as emotion pain, mental anguish, suffering, inconvenience, and loss of

enjoyment of life in the past, all of which were caused by Defendant's treatment of Plaintiff and, in all probability, Plaintiff will continue to suffer such damages in the future.

91. Plaintiff has exhausted all administrative remedies to recover under federal and state labor laws. Plaintiff timely filed her discrimination charge on August 25, 2020 and 180 days has passed since she filed.

## VIII. JURY DEMAND

101. Plaintiff respectfully demands a trial by jury on all issues to be tried in this matter. Plaintiff hereby tenders the jury fee.

## IX. PRAYER

102. Plaintiff sustained damages as a result of the actions and/or omissions of Defendant described herein. Accordingly, and for the reasons set forth above, Plaintiff respectfully prays that Defendant answer, and on final trial, that Plaintiff be awarded a judgment against Defendants for the following:

a. reinstatement to her last held position as Flight Attendant with all her benefits of seniority, years of service without gaps, and the same or increased rate of pay;

b. actual damages including but not limited to front pay and back pay;

c. pre-judgment and post-judgment interest;

d. court costs;

e. attorney's fees;

f. liquidated damages; and

g. all other damages to which she may justly entitled, including punitive and compensatory damages.

[Signature block on following page]

**MITBY PACHOLDER JOHNSON PLLC**

*/s/Steven J. Mitby*
Steven J. Mitby
State Bar No. 24037123
Federal Bar No. 33591
2700 Research Forest Drive, Suite 100
The Woodlands, Texas 77381
Email: smitby@mitbylaw.com

*Attorney in Charge for Anna Palova*

OF COUNSEL FOR PLAINTIFF:

Debbie S. Pacholder
Texas Bar No. 00784969
Federal Bar No. 17810
Email: dpacholder@mitbylaw.com
Kelly D. Clark
Texas Bar No. 24094781
Federal Bar No. 3456473
Email: kclark@mitbylaw.com
2700 Research Forest Drive, Suite 100
The Woodlands, Texas 77381

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing was on this date automatically accomplished on all known filing users through the Notice of Electronic Filing Service and/or in accordance with the Federal Rules of Civil Procedure on March 11, 2022.

*/s/Steven J. Mitby*
Steven J. Mitby